GREENMAN and others *v.* THE STEAM-BOAT NARRAGANSETT.

*(District Court, S. D. New York. ———, 1880.)*

1. COLLISION — STEAMER LEAVING SLIP — NINETEENTH ADMIRALTY RULE.—The steam-boat City Point, having the steamer Narragansett in full view on her starboard hand, and being 900 feet from the slip within which the steamer was slowly moving out, and their courses crossing so as to involve danger of collision, was signalled by the steamer, after having previously sounded her starting whistle. *Held,* under these circumstances, that the nineteenth rule was clearly applicable, and that the City Point was bound to keep out of the way of the Narragansett.

   *The Propeller John Taylor,* 6 Ben. 227.

2. SAME—EAST RIVER—NEGLIGENCE—RATE OF SPEED.—It is imprudent and reckless navigation for a steamer to run at the rate of not less than nine miles an hour at the distance of about 276 feet from the piers of the East river situated on the New York shore.

3. RATE OF SPEED—STATUTE.—A statute imposing a penalty for running along the piers of the East river at a speed exceeding 10 miles an hour, does not necessarily render a less rate of speed prudent.

*T. E. Stillman,* for libellant.

*W. R. Beebe,* for claimants.

CHOATE, D. J.  This is a suit brought by the owners of the steam-boat City Point to recover damages sustained by her through collision with the Narragansett in the Hudson river, off pier 33, at about a quarter past 5 o'clock in the afternoon, on the twenty-sixth day of June, 1877. The City Point was a side-wheel steam-boat about 204 feet in length. She was then running as an excursion boat between the city and the fishing banks, and was on her return trip. Having landed passengers at pier 2, she was proceeding up the river on her way to her next landing at the foot of Tenth street.

The Narragansett was a large side-wheel steamer running between New York and Stonington, and, at the time of the collision, had started on her regular trip for Stonington from her berth on the south side of pier 33, heavily loaded with freight and with a large number of passengers. Her length was about 253 feet. She came straight out from her slip

into the river, and, when her stern was a few feet clear of the end of the pier, her bow came in contact with the starboard side of the City Point, a little forward of her wheel-house. She was very nearly if not quite stationary in the water at the instant of the collision, while the City Point was running at her full speed, about 10 miles an hour. The effect of the collision was that the guard and deck of the City Point were broken from forward of the paddle-box to the after gangway. The face of the wheel-house was carried away, and her shaft was displaced and her machinery entirely disabled. The libellants claim damages to the amount of $17,000.

The Narragansett was injured by having her stem knocked to starboard. Otherwise she sustained no damage. The place of the collision **is** fixed with a considerable degree of certainty by its being a little more than the Narragansett's length out from the pier, and also by the fact that the donkey boiler which fell from the City Point was found to be 276 feet out from the end of the pier. The evidence also shows that the City Point was coming up the river at about that distance from the outer line of the piers She put her wheel hard a-starboard almost immediately before the collision, but not long enough before materially to affect her distance out into the river. As she struck the Narragansett she put her wheel to port. This movement and the headway she still retained carried her into pier 36, where she made fast.

The libel alleges that while the City Point was proceeding up the river her master saw, on his starboard bow, the Narragansett lying on the south side of pier 33, and when the City Point was about opposite pier 30 the Narragansett gave one long blast of her steam-whistle, indicating that she was about to leave her pier, to which whistle the City Point instantly responded by giving two short and distinct blasts of her steam-whistle, a signal to the Narragansett not to attempt to cross the course of the City Point; that the Narragansett did not answer the two blasts of the steam-whistle of the City Point, but, very shortly thereafter, put her wheels in motion and started forward to leave her slip on a course

crossing that of the City Point, and involving risk of collision; that, in spite of the precautions taken by the City Point, the Narragansett struck the City Point with her stem about amidships; that the collision was caused by the negligence and improper conduct of those on the Narragansett in not having a good and sufficient lookout, in leaving their pier at the time and on the course they did, in not keeping on the starboard side of and out of the way of the City Point and in not stopping and backing in time to avoid the collision, and was not caused by any fault or omission of those on board the City Point.

The answer denies all fault on the part of the Narragansett, and charges that the collision was caused entirely "by the gross mismanagement of those on the City Point; that she was not in her proper course, but was passing unnecessarily and too close to the docks, and but about the length of the Narragansett from the mouth of the Narragansett's slip; that the Narragansett was about to leave her dock when a long blast of her steam-whistle was sounded to indicate that she was about to leave her pier; to that long blast no response was given by any vessel or steam-boat; that thereupon her engines were started and she commenced to move slowly out into the river; as her bow emerged from the slip, the City Point, which had been previously hidden from the sight of those on the Narragansett by the sheds on the piers on the southerly side of her slip, was discovered hugging the piers on the New York side and then about abreast of pier 28, bound up; that immediately the Narragansett blew one whistle to indicate to the City Point that she, the Narragansett, would cross the bow of the City Point, to which signal the City Point, although she then had the Narragansett on her starboard hand, and should have given way and kept out of the Narragansett's way, responded with two whistles indicating that she, the City Point, would hold her course and cross the bows of the Narragansett; immediately a second and single whistle was blown by the Narragansett, and her engines were reversed at full speed, although she was then but

partly without her slip, and had it not been for the careless and wilful mismanagement of the City Point the collision might then have been avoided; the City Point was not stopped, but kept right on at a rapid rate of speed, nor did she sheer off, but kept on a straight course, and came into collision with the bows of the Narragansett after she, the Narragansett, had stopped headway and was moving astern; that the collision was caused by the fault of the City Point in being too close to the line of the piers, instead of being out further towards the middle of the river, in neglecting to stop when the Narragansett blew the long whistle, and also when the Naragansett blew, afterwards, one whistle, in that she did not change her course, but continued straight on up the river, in attempting to cross the bows of the Naragansett when she should have passed along-side of the port side and under the stern of the Narragansett, in continuing at a high rate of speed instead of stopping, and in not avoiding the Nargansett when she had her on the star board hand, as the law directs."

Pier 33, at which the Narragansett lay, was a covered pier, with openings in the south side of the shed, so situated that the steam-ship's gangways were always brought against the same points of the side of the pier, and so as to bring her stem about 45 feet inside the end of the pier. The stem of the Naragansett was 45 feet forward of the front windows of her pilot-house. She lay at the pier with her stem towards the river. Pier 32, the next below 33, is a short pier and of no account in this controversy. Pier 31, which is about 210 feet below pier 33, projects into the river about as far as pier 33. It is a covered pier, having a shed upon it which reaches within about 20 feet of the end of the pier, and for a distance of 25 feet back from that point rises to a height of 27 feet and 9 inches above the pier. The height of the captain's eye above the water, as he stands in the pilot-house of the Narragansett, when she is loaded, is about 31 feet. Consequently, at low stages of the tide, the shed on pier 31 effectually shuts out from those in the pilot-house of

the Narragansett, as she lies at her pier, the view down the river between the line of the piers and the line drawn from the pilot-house by the outer end of the shed on pier 31. While there is some controversy as to whether or not the tide was at the time of collision running up the river, there is no question that when the Narragansett left her pier she was so low in the water that, in fact, the shed on pier 31 obscured the view of the river inside of the line passing by this shed. The shed was not of the same height back of the 25 feet, and over this lower part of the shed a little of the river close in to the piers above pier 21, which projects further out than those above it, could be seen from the pilot-house; but this is of no consequence, since there is no claim that the City Point was within the space so exposed to view. The distance at which the City Point was running up the river, upon the evidence, is not precisely fixed, but it lay between the limits of 200 and 300 feet. Her master says about 300 feet.

It is conceded in the case that shortly before the collision the City Point gave a signal of two whistles in reply to a signal from the Narragansett, but the three chief points of the controversy as to matters of fact in the case are, what signals the Narragansett gave before this signal from the City Point; to what signal of the Narragansett this signal of the City Point was an answer; and at what distance in the river the City Point was at the time she gave this signal. The subsequent movements of the two vessels are too clearly proved to admit of doubt.

It is the contention of the City Point, as plainly alleged in the libel, that it was the long starting whistle of the Narragansett which the City Point thus answered; that the Narragansett had not then started, but, "shortly thereafter," put her wheels in motion; and that at the time of this exchange of signals the City Point was about opposite pier 30. Upon the hearing and in his brief, the learned counsel for the City Point takes somewhat different ground, claiming that the Narragansett did not blow her starting whistle at all, nor give any signal till she had moved forward so far as to bring

the City Point into view from her pilot-house. These two positions are irreconcileable, and the inconsistency does not strongly commend the case of the libellant; but I am satisfied that the great preponderance of the testimony is against the the truth of either theory. The evidence shows very satisfactorily that when the bell was rung to start the Narragansett, at the very same time her long starting whistle was blown, that at that time the City Point was not in sight from her pilot-house, being hidden from view by the shed on pier 31; that after the Narragansett had moved forward till her stem was up, or nearly up, even with the end of her pier, those in her pilot-house saw the City Point as she came in sight by the outer end of the shed; that it was then that the Narragansett gave the signal to which the City Point replied with a signal of two whistles; that this signal of the Narragansett was a single sharp whistle; that it was intended as a signal to the City Point, and indicated that the Narragansett intended to keep on across her bows, passing to the right of her; that it was so understood by the City Point, but that the City Point, in giving the signal of two whistles, disagreed to this, and indicated her purpose to cross the bows of the Narragansett, or to pass to the left of her. It is easy to demonstrate, from admitted or well-proved facts in the case, that the theory of the libel is an impossibility. To the point of collision, the stem of the Narragansett had moved forward not more than 308 feet from where she lay at the pier. If the City Point was at or near the place stated in the libel when she gave the signal of two whistles in reply to the Narragansett's long starting whistle,—she, the Narragansett, still lying at her pier,—then, before the collision, she ran about 650 feet only. The distance from a point midway between piers 29 and 30 to pier 33 is 600 feet, and the bow of the City Point ran about 50 feet beyond the point of collision. The City Point was running at least nine miles an hour. She claims that a strong flood tide was with her, which, if so, must be added to her speed. On hearing the Narragansett's signal her master first rung to slow and stop, but im-

mediately, and as quickly as the bells could be rung, he rang to go ahead full speed, wide open, and thereafter till the collision she was going forward with accelerated speed. Immediately upon receiving the signal of two whistles from the City Point the master of the Narragansett rang to stop and back full speed, and her engine was reversed as soon as was possible, and continued to work full speed astern up to the instant of collision, and the evidence is clear that at the instant of collision she had no perceptible headway on her. The precise point at which the bow of the Narragansett was when the order to reverse was given is not fixed, but I am satisfied by the evidence of those in her pilot-house that it was given as quickly as it could be given on receiving the reply of the City Point.

The point made by the learned counsel for the libellant, that there was delay in giving this order, seems to be based upon the testimony of one of the witnesses as to how far the Narragansett had run forward when this order was given. Th s was a matter of judgment merely as to distance. Some distance was run, undoubtedly, from the position when the single whistle was blown by the Narragansett. The Narragansett kept on till there was time for the City Point to reply, and for the master of the Narragansett to ring his bells. But the testimony of several entirely credible witnesses is to the effect that the order to reverse was given without any delay, and this must control the mere judgment as to distance run, which is little better than a guess at best. Now, it is entirely incredible that while the Narragansett, assuming that she started immediately upon giving her long whistle, starting from a dead stand-still, was running 308 feet and there coming to a stand-still again, the City Point, at a uniform speed of nine miles an hour, should have only gone forward 650 feet.

The City Point, if going nine miles an hour, made 780 feet in a minute. Experiments made with the Narragansett show that it ordinarily requires from one minute and thirty-three seconds to one minute and forty-five seconds for her to

go her length in starting, and this when her speed has been of course constantly accelerated. It is hardly possible, therefore, to conclude that, considering her having reversed her engines on this occasion and come to a dead stop within the 308 feet, that she was less than two minutes and a half in moving forward 308 feet. Probably she was considerably longer. In two minutes the City Point must have gone 1,560 feet. The testimony as to the highest speed which the Narragansett attained varies from a mile and a half to four or five miles an hour. These are, of course, but judgments upon a point very difficult to determine from mere observation, but it may probably be safely concluded that her average speed did not exceed three miles an hour, or one-third that of the City Point. Upon this supposition, while she was going 308 feet the City Point must have gone 915 feet, which would place her below pier 29 when the Narragansett started, and about up to pier 28; and three miles an hour for the speed of the Narragansett seems clearly an excessive estimate. It is entirely clear, therefore, that the City Point cannot have been about pier 29 or 30 when she heard and replied to the starting whistle of the Narragansett, if that was the signal she replied to, as stated in the libel. It is probable, upon the proofs, that she was considerably below pier 28 when the starting whistle was sounded. The testimony of Captain Walden, of the Narragansett, is, and it is confirmed by the other witnesses in the pilot-house, that the City Point came in view to him when she was at or below pier 28, as she was uncovered by the shed on pier 31. It is in evidence, on the part of the libellant, that at a point 207 feet out from the end of pier 29 the pilot-house of the Narragansett, as she lies at her pier, just comes into view to a person on the river, and at 251 feet out from pier 28 the pilot-house also comes into view. It is most probable, upon the evidence, that the City Point was more than 251 feet from the piers, and it is, I think, proved that when the Narragansett started the City Point was not in view from her pilot-house, but came into view shortly afterwards; and when the

Narragansett had slowly moved forward about 40 feet, and, of course, while the Narragansett was moving the first 40 feet, the City Point was moving many times that distance. It follows that the City Point must have been below, and probably considerably below, pier 28 when the Narragansett started. The testimony on the part of the libellant is singularly uniform that the City Point was about off pier 29 or 30 when she heard and replied to the starting whistle of the Narragansett. It is, however, also very indefinite as to the position, and, with most of the witnesses, apparently not given with reference to an actual observation at the time as to their position in relation to the piers. The testimony on the part of those in charge of the Narragansett, that when the City Point answered by a double whistle—not in reply to the starting whistle of the Narragansett, but in reply to another and later signal of a single whistle, after she had started and had gone forward some little distance—the City Point was as low down as pier 28 or lower, is confirmed by the testimony of by-standers having no interest in the cause; it is consistent, and it alone is consistent, with the necessary deductions to be drawn from the distances run by the two boats before the collision. And, upon the whole testimony, it must be held as proved that at this exchange of signals the City Point was down at least as far as pier 28, a distance of 900 feet from the line on which the Narragansett was coming out, and that those on the City Point had failed to notice the starting whistle of the Narragansett, which had just before been blown, although the testimony is that it could be heard two miles. This being the relative positions of the two vessels, the Narragansett being in motion, though slowly, when she blew the single whistle, and the City Point having the Narragansett on her starboard hand, and their courses crossing so as to involve danger of collision, the nineteenth rule clearly applies, and the City Point was bound to keep out of the way of the Narragansett. *The Propeller John Taylor,* 6 Ben. 227.

It matters not that the Narragansett was still within the slip when she blew this whistle. She was in full view of the

City Point, and it must have been obvious if those on the City Point watched her, that she was in motion and not lying still at the dock. They had a full view of her bow and of her port side, aft, as far as her pilot-house, and they could see that she was moving out, even if they had failed to notice the starting whistle which was notice to them that she was about to start her engines. The master of the City Point was also perfectly familiar with the starting time of the Narragansett, which was 5 o'clock, and he knew that she was already late. It was a violation of a positive rule of navigation, therefore, for the City Point not to give way and allow the Narragansett to proceed. Instead of giving two whistles, which showed her purpose to go across the bows of the Narragansett, she should have slowed up, and, if necessary, stopped till the Narragansett had gone by. By giving the double whistle she forced the Narragansett to stop and back, which was then the only means of avoiding a collision.

The Narragansett did her utmost, by stopping and backing, to prevent a collision, and if the City Point had done the same, upon finding that there was a disagreement in the signals, there would have been no collision. It is claimed on the part of the City Point that she was unable to avoid a collision by stopping and backing; that she had neither time nor space to stop her headway. There is no foundation for this claim. Upon the evidence, she could be stopped in two or three of her lengths, and there is no proof of a wind or tide just at that time and place seriously increasing the difficulty in stopping her. As to the wind, it was not sufficiently strong materially to affect the navigation of the vessels. As to the tide, the testimony of the witnesses is irreconcilable. The almanac shows that the flood tide had been running an hour and a half, but I think the weight of the testimony is that in that part of the river there was, at that time, no current up stream. It was shown that the debris from the wreck floated out a little way into the river, but remained subsequently stationary for 15 or 20 minutes. But even if the tide was running flood, as claimed, the testimony will not war-

rant the conclusion that the City Point could not be stopped within the distance that she was from the Narragansett. The testimony that she could not be stopped is based mainly on the theory that she was up to pier 30, which, as shown above, is unfounded. There is a suggestion in the evidence that she was peculiarly hard to handle and difficult to stop. While this is not proved to the extent of showing that she could not be stopped in three times her length, it would not help her case if it were shown; since, if she was so exceptionally hard to stop, it was very imprudent and unsafe for her to run at full speed so near the docks, where she was almost certain to be brought into a position at any minute requiring her to stop suddenly on account of something coming out from between the piers and crossing her course.

It follows, therefore, that the Narragansett was not in fault for giving the single whistle, or for keeping on her course till she received the conflicting signal from the City Point; that the City Point was in fault in giving that signal and in not giving way to the Narragansett, and in not stopping and, if necessary, backing, to avoid the Narragansett, upon discovering her and receiving her signal. After receiving the signal of the City Point the Narragansett did all she could to avoid the collision or diminish its dangers. Her conduct in this respect was in striking contrast to that of the City Point. The City Point could have avoided the collision either by stopping and backing, or by throwing her wheel instantly hard a-starboard, neither of which she did. Just before the vessels came together the Narragansett gave another single whistle. The collision was then inevitable. The signal was not called for by the situation, but it did neither good nor harm. It is stated in the answer that this whistle immediately followed the double whistle of the City Point, but the proof is that it was later, and just before the vessels struck. I do not see that it has any material bearing on the controversy.

It is claimed that the Narragansett was in fault in not sooner discovering the City Point; that she should have had

a man posted on the end of the pier who would have an un-obstructed view up and down the river, to give warning before she started of any approaching vessel, or a man on top of the wheel-house, from which point an unobstructed view could be had down the river over the shed on pier 31. It may be that a case may arise where a steam-boat going out as the Narragansett does, as she blows her starting whistle, may not by this signal give a sufficiently timely warning to a vessel that happens to be very near and approaching from above or from below close into the piers and under cover of the shed, so as to enable the approaching vessel to avoid her after hearing the starting whistle. And it is possible that in such a case it may be held negligence not to have taken precautions to see the vessel approaching; but that is not this case. The starting whistle was notice to the City Point that she was just starting to come out, and when she came out and made the City Point there was ample time and space for the vessels to avoid each other by observing the ordinary rules of navigation. The only danger of collision, then, was from the violation of these rules on the part of the City Point. The failure of the Narragansett to see her had not involved the vessels in any risk of collision, and, if her position had been clearly understood when the Narraganset was ready to start, I see no reason why she should not have come out just as she did; her signal to the City Point was timely and proper. There was no occasion for the lookout on her bow to report the City Point. She was not near enough before the Narragansett signalled her to suggest any danger, and, by the rules, she was required to keep out of the way. The second mate was temporarily on the lookout, waiting for another of the ship's company to take that post. He did not think a report necessary, and I am not able to say that there was, in this omission, any fault which caused or contributed to cause this collision.

The proof is that the piers between piers 21 and 33, and above, are steam-boat and ferry piers, to and from which steam-boats are constantly passing; that several of the sound steam-boats go out about the hour the City Point was

coming up that afternoon. Considering the use of these piers, and the great number of steam-boats going in and out, it was imprudent and reckless navigation for the City Point to run at so great a speed so near the line of the piers. A statute of New York is referred to prohibiting vessels from running along the piers on the East river at a speed exceeding 10 miles an hour, as if this justified the City Point in the speed she kept up. But imposing a penalty for exceeding 10 miles by no means makes any less speed prudent. The speed must be regulated by the dangers attending the navigation under the particular circumstances of the case. There was no reason for the City Point keeping so close to the piers except her own convenience to make the shortest run to her next landing. If she chose to go so close in, she was bound to proceed with the more caution, and in such a way that she could check her headway easily, for she was constantly liable to have her course crossed by other vessels proceeding slowly out of the docks and on her starboard hand.

Upon the whole case, it is clear that the collision was caused solely by the gross carelessness and mismanagement of those in charge of the City Point.

Libel dismissed, with costs.